284 So.2d 362 (1973)
NEW ORLEANS TRANSFER COMPANY, INC.
v.
CITY OF NEW ORLEANS and Mayor Moon Landrieu.
No. 5940.
Court of Appeal of Louisiana, Fourth Circuit.
October 19, 1973.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre and Ernest A. Carrere, *363 Jr., Charles W. Lane, III, and Ignatz G. Kiefer, New Orleans, for New Orleans Transfer Co., Inc., plaintiff-appellee.
McCloskey, Dennery & Page, Moise W. Dennery, New Orleans for National Center for Resource Recovery, Inc., intervenor-appellant.
Blake Arata, City Atty., David Cressy, Deputy City Atty., for City of New Orleans and Mayor Moon Landieu, defendants-appellants.
Before LEMMON, BOUTALL and BAILES, JJ.
BOUTALL, Judge.
This is an injunction suit brought by New Orleans Transfer Company, Inc. to enjoin the City of New Orleans and its Mayor from executing and carrying out a ten year contract with National Center for Resource Recovery, Inc., and Waste Management, Inc., for the purpose of processing and disposing of a large portion of the solid waste material or garbage for the City of New Orleans. The trial court rendered judgment decreeing the proposed contract to be illegal and violative of the laws relating to public bidding and issued a permanent injunction enjoining the execution and carrying out of the proposed contract. From this adverse judgment, the City of New Orleans has appealed.
Plainly put, the question is whether the City can negotiate the proposed contract or whether the contract is subject to the requirement of public bidding under the pertinent laws.
The general law applicable to public contracts for purchases of materials or for services is stated in LSA-R.S. 38:2211, a portion of which we quote:
"§ 2211. Advertisement and letting to lowest responsible bidder.
"A. All public work exceeding the sum of two thousand five hundred dollars including both labor and materials to be done by any public corporation or political subdivision of the state and all purchases of materials or supplies exceeding the sum of one thousand dollars to be paid out of public funds shall be advertised and let by contract to the lowest responsible bidder who has bid according to the contract, plans and specifications as advertised, and no such public work shall be done and no such purchase shall be made except as provided in this Part. * * * *"
Additionally we refer to the Home Rule Charter of the City of New Orleans and particularly to Section 6-307 which provides in part as follows:
"Section 6-307. Contracts. * * *
"(5) Except in the purchase of unique or noncompetitive articles, competitive bids shall be secured before any purchase, by contract or otherwise, is made or before any contract is awarded for construction, alteration, repair or maintenance or for the rendering of any services to the City, other than professional services, and the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder after advertisement prescribed by ordinance or by applicable State Law."
It is apparent from the plain wording of the statute and the charter provision mentioned above that the law requires all contracts for goods or services above the stated amount to be offered for public bids unless the contract comes within one of the stated exceptions. It is argued to us that the proposed contract is a contract for professional services, and services of a unique and noncompetitive nature, such that no bids could be reasonably obtained, nor could fair specifications be prepared to enable a bidder to knowledgeably and fairly bid. We turn therefore to an examination of the proposed contract.
For several years the officials of the City of New Orleans had been concerned *364 over the inadequacies of the city's incineration system of garbage disposal, particularly noting the high cost of the system as well as the difficulty of meeting environmental standards. As a result the City undertook a study to find an effective solution to the problem, and made a very thorough and exacting investigation over a period of two years, including consultation with numerous authorities in the field. The study resulted in the conclusion that pulverization and land fill was the best method for dealing with the disposal problem faced at that time. Along with this process the resource reclamation was considered, but it was felt at that time that it could not be economically provided within the technology available. However the city officials considered that this was a desirable goal, and continued inquiries along this line, and were referred to the National Center for Resource Recovery, Inc. The National Center was founded as a nonprofit organization funded by members of the industry in order to promote research and development in the field of resource recovery. The City and the National Center began working together to determine if the National Center could provide the City with a solution to its problems, and at the same time, the City would in effect become one of the proving grounds for the successful operation of Resource Recovery.
In August of 1972 the City invited numerous contractors and companies involved in waste disposal to attend an informal conference in New Orleans at which time the city distributed three alternative forms of bid specifications for solid waste disposal. Specifications 1 and 2 invited bids for shredding and land filling of solid wastes and contemplated a resource recovery operation under which the city would receive 25% of any profit generated. Specification 3 invited bids to provide a "turnkey" facility for the city to operate its own pulverization process. The course of events demonstrated that there were a number of companies interested in handling the waste disposal system for the city of New Orleans, dependent of course upon the process involved and the specifications necessary. In any event the city continued its operations with the National Center, which soon determined that New Orleans was indeed a good prospect for a resource recovery project because of its location and the necessities of the city, and to this end the National Center entered into negotiations with several waste disposal companies in order to seek a workable and economical system for the recovery of resources from waste. Among the major two considered were plaintiff and Waste Management, Inc.
Because of the high risk involved in such an undertaking, both of these companies were somewhat reluctant to enter the field of resource recovery, however the National Center determined that Waste Management, Inc. was more receptive to co-operation with the National Center, in that it promised to make a full disclosure of all of its operations in order to make the results of the studies and actual operation open to the public for use and benefit of other potential waste disposal operations. Thus it was that the proposed contract came into being and was presented to the governing authority of the city for its consideration as the method of future solid waste disposal.
The contract itself has three parties, the city, the National Center for Resource Recovery, Inc., and Waste Management, Inc. The major obligations of the contract are as follows: The city is obliged to furnish the site for the construction of the waste disposal plant, together with suitable area for land fill and to provide access and utilities to the site. After completion of the plant the city is obligated to furnish an average of 650 tons per day, six days per week of solid waste from householders, and to pay Waste Management $5.85 per ton of solid waste delivered. Waste Management is obliged to construct an operating plant consisting of 2 units or *365 modules, one basically for the pulverization and treatment of solid waste for land fill purposes, and the other for recovery of such products as paper, ferrous materials, aluminum and glass, in general accordance with the proposed materials recovery system specified by the National Center. The operating plant is excepted to cost in the neighborhood of three million dollars and remains the property of Waste Management. Waste Management agrees to process the garbage delivered and attempt resource recovery for at least three years. The materials not recoverable are to be used to landfill the city owned property. After three years if the resource recovery is found not feasible, then all of the solid waste is to be processed and used for landfill. If any profits are made on resource recovery, Waste Management agrees to pay the city 15% of such profits.
The National Center is obliged to furnish all of the research and technical data necessary to a successful operation, and indeed has completed the major basis for a materials recovery system as demonstrated by its engineering feasibility study of December, 1972, which forms the basis of the proposed operation herein. Since the reclamation process has never been attempted on the proposed scale, the National Center would provide continuing expertise in developing the system, and would supply $750,000 of risk capital which would cover losses of operation up to $250,000 per year for the first three years. The National Center further obligates itself to obtain contractual commitments from markets for the reclaimed materials. Additionally, all of the parties are obligated to cooperate with each other and to make available to the general public or anyone interested in waste disposal problems, all of the information obtained in the operation of the system, with a view to assisting other governmental agencies in their solid waste disposal problems.
After a thorough examination of the proposed contract, we are convinced that there is nothing unique or noncompetitive about it except for the obligations of the National Center. From its standpoint, the National Center makes no money on the contract, but indeed obligates itself to pay up to $750,000 if losses occur. Its only purpose is to assist in the development of a resource recovery operation, which could be used to great advantage by other communities and help conserve our natural resources. Its motives are truly altruistic. A contract between the city and the National Center would undoubtedly be a proper subject for noncompetitive bidding. However, the inclusion of Waste Management, Inc., a regular business corporation engaged in the garbage disposal business, is something entirely different. Its relation to the city in this contract is simply to dispose of a certain portion of the city's solid waste in a particularly described fashion for a price calculated to be in excess of $10,000,000 over a ten year period. While it has a unique obligation to the National Center, that is it will cooperate with the National Center and change its operation in accordance with suggestions made by the National Center, and for which it may be reimbursed to the tune of $250,000 per year, it has no unique obligations with the city at all. The services it is furnishing is basically a solid waste disposal operation and should be subject to the public bidding laws.
The general rule relating to the interpretation of the public bidding laws has been laid down by the Supreme Court of Louisiana in the case of Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627 (1943), in which the court stated:
"This statute in so far as it requires advertising and the obtaining of competitive bids is a prohibitory law founded on public policy. It was enacted in the interest of the taxpaying citizens and has for its purpose the protecting of them against contracts of public officials entered into because of favoritism and involving *366 exorbitant and extortionate prices. It was not passed for the benefit of the officials and the entities which they represent.
"A contract made in violation of that statutory requirement is wholly illegal. According to the great weight of authority, it is unenforceable even though the work has been performed or materials furnished; neither can recovery be had on a quantum meruit basis." * * * (14 So.2d 627 at 631.)
This principle has been reiterated by the Supreme Court in the case of Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (1949), and in the case of Bartley, Inc. v. Town of Westlake, 237 La. 413, 111 So.2d 328 (1959).
There is no contention in the present suit that there was any favoritism or exorbitant prices involved in the city's efforts to enter the proposed contract. On the contrary, the record discloses that the city officials undertook a project of vast dimensions over a period of a number of years and exerted themselves to the utmost in order to secure the best possible solution to the city's waste disposal problem. It may very well be that the negotiated contract terms herein involved may be better than those that would have been received as a result of public bidding. Of course the question cannot be answered one way or another because no one else has had an opportunity to enter a bid upon the project and it is this denied opportunity that is pertinent here. Our courts have consistently stated that open competitive bidding is a thing to be desired, and have struck down with nullity any system whereby it appeared that the specifications were unduly restrictive or there was a stifling of competition. In this regard we refer to the cases of Redersheimer v. Flower, 52 La.Ann. 2089, 28 So. 299 (1900) and the case of McCutcheon v. City of Shreveport, 157 La. 699, 102 So. 875 (1925), both of which grew out of specifications for particular types of paving components. This same rule has been followed in the case of Parish Council of Parish of East Baton Rouge v. Louisiana Highway and Heavy Branch of Associated General Contractors, Inc., 131 So.2d 272 (La.App. 1st Cir. 1961) wherein it was held that a minimum wage rate could not be made a requirement of a proposed contract inasmuch as it would stifle competitive bidding to the lowest responsible bidder. To the same effect is the case of Stevens Concrete Pipe & Products, Inc. v. Burgess, 202 So.2d 498 (La.App. 1st Cir. 1967) wherein it was held that specifications of certain length pipe for use in a public improvement contract stifled competitive bidding.
We have been referred to a number of cases outside the jurisdiction of Lousisana which would indicate that the contract with which we are here concerned should be considered as a subject of negotiation rather than public bidding. As to these cases we simply say that it is our opinion that the law of Louisiana favors public and competitive bidding and does not favor negotiation of contracts, and the above cited authorities stand for such a proposition. We are of the opinion the portion of the contract entered into with Waste Management, Inc. should be subject to public bidding, and the city cannot remove it from that class of contract by the inclusion of the National Center in the contract. To permit such a contract without public bidding would be to place the city in the position of doing indirectly that which it could not do directly, that is, let a contract for basic services, such as solid waste disposal, without advertisement and public bidding. See for example Associated General Contractors v. Police Jury of Pointe Coupee Parish, 225 So.2d 300 (La.App. 1st Cir. 1969).
For the foregoing reasons we are of the opinion that the contract is in violation of *367 the public bidding law, and that the judgment appealed from, issuing a permanent injunction prohibiting its execution is affirmed.
Affirmed.