346 So.2d 359 (1977)
TRANSPORTATION DISPLAYS, INC.
v.
CITY OF NEW ORLEANS, Moon Landrieu, Mayor of the City of New Orleans, the Council of the City of New Orleans, New Orleans Aviation Board, Paul J. Stoulig, Director of the New Orleans Aviation Board and Hart and Johnson Air Terminal Advertising Company of Louisiana, Inc.
No. 7975.
Court of Appeal of Louisiana, Fourth Circuit.
May 23, 1977.
Rehearing Denied June 7, 1977.
*360 Martzell & Montero, John R. Martzell, New Orleans, for plaintiff-appellee.
Philip S. Brooks, City Atty., and Jacob Taranto, III, First Asst. City Atty., and Herbert W. Christenberry, Jr., Asst. City Atty., for City of New Orleans, Mayor Moon Landrieu, and the Council of the City of New Orleans, and for the New Orleans Aviation Board and Paul J. Stoulig, defendants-appellants.
William A. Glennon, Jr., New Orleans, for Hart and Johnson Air Terminal Advertising Co. of Louisiana, Inc., defendants-appellants.
Before SAMUEL, REDMANN and LEMMON, JJ.
LEMMON, Judge.
This litigation involves an exclusive contract "to conduct the sale of advertising space and facilities" at New Orleans International Airport. The issues on appeal are (1) whether defendant New Orleans Aviation Board must conduct public bidding in awarding the contract and, if so, (2) whether the condition in the Board's invitation for bids, which imposes responsibility for payment of residuals due under the previous contract, prevents bidding on a substantially equal basis.
Beginning in 1961 the Board entered into a series of contracts with defendant Hart and Johnson Air Terminal Advertising Company of Louisiana, Inc. for services on a commission basis in handling the sale of display advertising at the airport. The last of the series was a four-year contract beginning in 1972.
Before entering into the 1972 contract the Board for the first time advertised for *361 bids. When the April, 1976 expiration date of that contract approached, the Board advertised for bids for a new contract through the City's Department of Finance. The Request for Proposal, prepared by the Board, outlined the various required provisions of the contract to be executed and called for the bidders to offer a percentage of "collected gross sales derived from the sale of all advertising spaces, displays and facilities" or a specific sum, whichever is greater. The Request for Proposal also notified bidders that residuals due to Hart and Johnson under the 1972 contract (25% of gross receipt on each existing advertising contract for up to 30 months) would be "the responsibility of the successful bidder and will not be paid from the Board's guarantee minimum or from the percentage of gross".
Two bids were submitted, one for 52½% of all gross receipts with a $500,000.00 minimum guarantee by Hart and Johnson and the other for 50% of most gross receipts and a higher percentage of others with a $490,000.00 minimum guarantee by Transportation Displays, Inc. (TDI), a Louisiana subsidiary of a national advertising agency. Shortly thereafter, but before the bids were to be opened, TDI filed this suit, seeking to enjoin the Board from accepting any bids under the original invitation for bids and requesting the court to order resubmission of the invitation for bids without the requirement as to the residual condition. The court granted the requested relief, and the Board, the City, and Hart and Johnson appealed.
Applicability of Public Bid Law
Defendants first contend that the public bidding law, although applying generally to contracts for services, does not apply to this contract because of the professional services exclusion.[1] This contention requires an analysis of the nature of services performed under the contract.
The business of airport terminal advertising, while highly specialized, is obviously not non-competitive.[2] The question as to whether competitive bidding by firms providing these services is feasible and is contemplated by the public bidding laws must be determined by the terms of the contract required of the successful bidding firm and the services performed by the present firm.
The invitation to bid stipulated that the contract with the successful proposer contain provisions granting the proposer "the exclusive right to conduct the sale of advertising space and facilities as set forth in the contract in the terminal building and adjacent facilities at the airport" and requiring the proposer "when necessary (to) design, plan, and supervise the construction of displays to occupy the advertising space, or assist the advertiser in such functions as required, and sell such advertising space and facilities in accordance with accepted advertising principles". Another required provision called for the initial allotment of advertising space and locations for advertising displays in accordance with a layout exhibit on which the space and locations were marked, but provided further for Board approval of any use of space not specifically allocated. Other pertinent provisions required the proposer to "supply necessary sales efforts and costs for the selling of any and all displays", to "approve and be responsible for the quality of displays installed in the terminal", the Board reserving the right to approve and disapprove any advertising contract or display, *362 and to "supply all facilities and displays to be used in the Terminal".[3]
Under the overall scheme of the operation and the required contract the successful proposer contracts directly with the advertiser, subject to Board approval, and the advertising contracts are assigned to the Board in the event of termination or cancellation of the services contract. Significantly, the existing printed form advertising contracts contained in the record (P-18 and 19, in globo) require the advertiser client to furnish all displays and to maintain all visual, audio and animated components of the display.
Our analysis of the numerous exhibits, as well as the extensive testimony, leads to the conclusion that the principal function of the Board's agent is to sell advertising space and to own and maintain the cases in which the advertising displays are contained. The agent is even told the amount and location of the displays. The displays themselves, the production of which apparently requires creativity, skill, taste and artistic talent, are produced by others and supplied to the agent, whose approval and responsibility for the quality of the displays is subject to the Board's approval.
The testimony of the Director of Aviation supports this conclusion. He stated that the display advertising agent sells advertising space to potential advertisers, that the sale "results in a display being installed in the airport", and that the agent has an employee who regularly maintains the displays.
Hart and Johnson's president testified that an ordinary advertising agency cannot sell airport advertising because an airport specialist calls on other agencies' customers. However, nowhere in his testimony did he describe or even mention any activities besides selling.[4]
The personal services exclusion (by statute or by court rule) from competitive bidding of public contracts has generated considerable litigation. See 15 A.L.R.3d 733 (1967). Generally, the public body is allowed to exercise discretion in contracting for services which require use of creative and individual talents or unique artistic skills, or which require counseling and advice based on training and experience in fields of science or learning, or which otherwise require such extraordinary skill and learning that other factors far outweigh monetary considerations in determining the acceptability of the bidder.
Perhaps the "professional services" exclusion in the present case is more *363 restrictive than the "personal services" exclusion discussed above.[5] Or perhaps the word "professional" should be broadly interpreted to include any unique personal services for which the competitive bidding requirements would not serve the best interest of the public. From either view this record does not show that the selling services contemplated by the contract under consideration are the type of services which are properly excluded from public bidding.[6]
Effect of the Residual Payment Condition
The prospective bidder on the 1976 advertising contract was required by the invitation to bid to be responsible for the residuals the Board was obliged to pay Hart and Johnson under the provisions of the 1972 contract.[7] TDI's opposition urged that this requirement tends to exclude new bidders who must consider that a substantial part of its gross income will go to the losing incumbent contractor.
TDI's vice-president calculated, in preparing its bid, that more than $76,000.00 would be due to Hart and Johnson over a 30-month period. He stated that if his firm had not been required to pay this amount to Hart and Johnson, he could have submitted a higher bid.
A firm desiring to bid on the 1976 contract, in order to decide the percentage of "collected gross sales" to offer the Board, had to estimate the total amount of gross sales and also to determine the least amount it would take for its services. Because of the residual provision every bidder had to deduct from anticipated gross sales the amount of the Board's obligation to Hart and Johnson for fees already earned under the terms of the 1972 contract, and the total amount of gross sales available for consideration as to the Board's percentage and the agent's fees was accordingly reduced as to all bidders. In effect the residual provision was a reservation by the Board of the amount necessary for payment of an obligation already incurred by the Board with respect to part of the anticipated gross sales.
The 1972 contract had entitled Hart and Johnson to the residuals, no matter which firm was the successful bidder on the 1976 contract. The fact that this amount of the gross sales anticipated during the term of the 1976 contract was already committed and thus unavailable for any bidder to consider in determining the percentage to offer the Board may have created a disadvantage to the Board, but did not create a disadvantage to a particular bidder, since all bidders had to consider this obligation in preparing bids.[8] Perhaps TDI is really questioning the wisdom of the 1972 contract provision, *364 but it is not the function of the judiciary to determine such issues.[9]
We therefore conclude that the bidding provision requiring the successful bidder to pay from collected gross sales an already incurred obligation of the Board did not prevent bidding on a substantially equal basis. Although we have also concluded that the 1976 contract was subject to public bidding, there was really no complaint that the proper bidding procedures were not followed. The question as to whether the contract was subject to public bidding was merely ancillary to the attack on the residual provision as stifling of competitive bidding.
Accordingly, the judgment of the trial court is reversed, and it is now ordered that plaintiff's suit be dismissed. Each party is to bear its own costs.
REVERSED AND RENDERED.
NOTES
[1] Section 6-307(5) of the Home Rule Charter of the City of New Orleans, provides:

"Except in the purchase of unique or noncompetitive articles, competitive bids shall be secured before any purchase, by contract or otherwise, is made or before any contract is awarded for construction, alteration, repair or maintenance or for the rendering of any services to the City, other than professional services, and the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder after advertisement prescribed by ordinance or by applicable State law." (Emphasis supplied)
[2] The Hart and Johnson firm has contracts with 33 airports and is the only national firm which handles airport advertising exclusively. TDI has contracts with 80 airports, but also sells display advertising in commuter railway systems, and its parent corporation handles other transportation advertising. Few other agencies handle multi-airport advertising.
[3] At the time of the first contract in 1961, the Board purchased and installed all display cases. Under the 1965 contract Hart and Johnson purchased and installed display cases, subject to a payment schedule and subject to Board approval of the number, cost and location of the cases. The 1968 contract required Hart and Johnson to supply and own all "cases and displays". The 1972 contract required Hart and Johnson to supply all "facilities and displays".

In 1976 Hart and Johnson owned all the advertising equipment. (Since, as will be seen later, the advertiser furnished all displays, the equipment apparently consisted of the display cases). Its president testified that the equipment represented a capital investment of $30,000.00 to $50,000.00.
There are no photographs of any displays or display cases in the record. Hart and Johnson's brochure (attached to P-10) indicates that the firm is not a "display builder", but "rather a sales organization with creative abilities to help design interesting displays for air terminals". The brochure also indicates the firm supplies clients with "standard" display cases, but as to non-standard cases or freestanding units, "(t)hese units are furnished by the client" and "Hart and Johnson furnishes only the approved display area".
[4] For example, this officer distinguished their agency from a concessionaire, who has income from sales in a certain area of the airport, while his firm generates its income from sales made outside. In the same context he defended the residual provision on the basis of entitlement as a salesman to a portion of the continuing revenues that the original sale generates.

His overall testimony indicated that the firm's job is production by sale of a client-advertiser and not production of the advertiser's display materials. Logical analysis also indicates that each advertiser would generally have a public relations firm or advertising agency to coordinate its overall advertising program and to furnish displays consistent with that program, while the airport agent merely sells the space in which are displayed the materials which the individual advertiser furnishes.
[5] "Professional" is not used here to describe the quality of the services or to distinguish the highly proficient from the mere amateurs, but rather denotes a person in a profession which requires years of education and service for one to attain competence and which calls for a high order of intelligence, skill and learning.
[6] If the City were to hire an advertising agency to attract tourists by designing an advertising program for that purpose for use in airports throughout the country, perhaps that contract would be appropriate for exclusion from public bidding, since the City under those circumstances should exercise discretion in hiring an agency whose creativity and skill best suits the purpose. But in the present case it is the advertiser who employs such an agency, and the City's agent merely sells space to the advertiser.
[7] The residual condition in Hart and Johnson's 1972 contract was as follows:

"Upon termination of the contract for any reason, the Firm shall receive 25% of all gross receipts received from the advertisers on all contracts negotiated and consummated for the balance of the term of such customer contract, without reference to any guaranteed sums. At the time of termination all customer contracts shall be assigned to the Board, and the Board will pay to the Firm, on a quarterly basis as collected, the 25% of the actual collected gross revenue until such time as such customer contracts then in force have expired, or for 30 months from the contract date, whichever is less. The Firm will not be required to maintain the displays during the time it received the aforesaid 25% receipts."
[8] Much more apparently stifling of competitive bidding was the requirement that the bidder "have existing contracts with at least five (5) air terminals . . . ." However, that issue was neither raised nor argued and is not properly before us.
[9] Indeed, TDI's vice-president emphasized that the estimated $76,000.00 "represents the amount lost to the New Orleans Aviation Board as potential increased revenue (over the period of the 1976) because of the residual caluse". This amount, however, is "lost" to the Board regardless of which firm is the successful bidder.