390 So.2d 1361 (1980)
The COUNCIL OF the CITY OF NEW ORLEANS: Joseph Giarusso, Frank Friedler, Jr., Michael Early, Sidney Barthelemy, Broderick Bagert, Phillip Ciaccio, Individually and as Members of the Council of the City of New Orleans, Louisiana Health Services and Indemnity Co., Inc.
v.
Honorable Ernest A. MORIAL, Mayor of the City of New Orleans, Reynaud J. Rochon, Chief Administrative Officer of the City of New Orleans and Jack A. Parker & Associates, Inc.
No. 11252.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1980.
Rehearing Denied December 19, 1980.
David A. Marcello, Executive Counsel to Mayor, New Orleans, Joseph H. Hurndon, Deputy City Atty., Marc. G. Shachat, Asst. City Atty., Salvador Anzelmo, City Atty., for defendants-appellants.
Martzell, Montero & Lamothe by John R. Martzell, New Orleans, for City Council, plaintiffs-appellees.
Bronfin, Heller, Feldman & Steinberg, New Orleans, for Louisiana Health Services & Indemnity Co., Inc., plaintiffs-appellees.
Tucker & Schonekas by Russell J. Schonekas, Arthur S. Mann, III, New Orleans, for Jack A. Parker & Associates, Inc., defendant-appellant.
Before SAMUEL, GULOTTA and BOUTALL, JJ.
BOUTALL, Judge.
This is an appeal by the defendants-appellants, the Mayor of the City of New Orleans, et al. from a judgment of the trial court declaring that the action by the defendants-appellants in negotiating a contract with Jack A. Parker & Associates, Inc. for administrative services in connection with the City's Self Insured Employee Health Care and Hospitalization plan was not in accordance with the public bidding laws and that such a contract should have been the subject of public bidding as provided by the City of New Orleans Home Rule Charter provision § 6-307(5).
Beginning on January 1, 1978, the City of New Orleans became self-insured as to health care coverage for its employees under a plan which it had formulated. Administration of this health care plan was *1362 then supplied by Louisiana Health Service & Indemnity Company, (hereinafter referred to as Blue Cross), which formerly enjoyed a position as insurer for the city prior to January 1, 1978. On January 25, 1979, Blue Cross was informed by the city through Reynaud J. Rochon, Chief Administrative Officer that its services would be terminated effective March 31, 1979. This termination was in accordance with the terms of the contract between the parties.
On April 1, 1979, the city entered into a contract with Jack A. Parker & Associates, Inc., wherein the latter was to perform the same administrative services under the health care plan which had previously been performed by Blue Cross. This contract was entered into pursuant to negotiations between Parker and the city. No public bidding was advertised nor held during the formulation of this contract.
On March 27, 1980, six members of the New Orleans City Council, individually and as members of the council, and Blue Cross brought an action for declaratory judgment and injunctive relief against Ernest A. Morial in his capacity as Mayor of the City of New Orleans, Reynaud J. Rochon, as Chief Administrative Officer, and Jack A. Parker & Associates, Inc. After exceptions of improper cumulation of actions were maintained, plaintiffs abandoned the request for injunctive relief and proceeded only on the declaratory judgment proceedings. They sought a declaratory judgment declaring that the contract for administrative services for the city's health care plan for its employees is covered by the public bid laws as set forth in the Home Rule Charter of the City of New Orleans and the laws of the State of Louisiana, and must be secured by public competitive bidding according to law. The effect of this was to seek to have the contract declared void and public bidding held for the services provided therein.
The trial judge in his reasons for judgment thoroughly considered the problems involved in such a contract, and after weighing the problems in correlation to the efficient and proper administration of the city government for the best interest of its citizens and the operation of the public bidding law, also designed to protect the public interest, found that the better means to accomplish the public good would be by public bid. Accordingly the judge declared that the contract for administrative services for the Employees Self-Insured Hospitalization program was covered by the public bid law set out in the Home Rule Charter in the City of New Orleans, and decreed that the contract now be placed under proper procedural aspects for public bid. This appeal followed.
Initially we point out that there is no issue in this case as to compliance with the contract by Parker, nor is there issue that the city administration acted in anything but good faith in an attempt to achieve the maximum benefits for its employees and the interest of its citizens. The sole issue is whether this contract, as a matter of law, is one which is required to be advertised for public bidding under the Home Rule Charter, or whether it is excepted from those provisions. The pertinent part of the charter is Section 6-307(5):
"(5) Except in the purchase of unique or non-competitive articles, competitive bids shall be secured before any purchase, by contract or otherwise, is made or before any contract is awarded for construction, alteration, repair or maintenance or for the rendering of any services to the City, other than professional services, and the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder after advertisement prescribed by ordinance or by applicable State law." (Emphasis added.)
Thus the resolution of this case revolves about the meaning of "professional services" as the basis for determination whether the contract shall be subject to competitive bidding or may be negotiated. Under the terms of the contract, the Administrator agrees to the following:
"A. Provide the City with services for the administration and operation of the *1363 Plan. These services will be coordinated by an account executive of the Administrator to help assure an efficient operation of the Plan.
"B. Review the Plan attached hereto at the request the City initially and in connection with benefit revisions, additions and extensions, including underwriting advice and cost estimates and projections.
"C. Assist in the development, design and installation of administrative and record keeping systems.
"D. Assist in the development, design and installation of systems and forms for processing requests for benefit payments.
"E. Assist in the preparation of accounting reports for use by the City in the financial management and administrative control of the Plan.
"F. Process all claims presented by eligible participants for the payment of medical expenses in accordance with the Plan and to pay such benefits if a claim in its judgment qualifies for payment. Claims to be processed under this agreement shall include only claims commencing on and after April 1, 1979.
"G. Provide a monthly accounting of all benefits paid pursuant to this Agreement together with a statement of its service charges for the same month.
"H. Provide claim forms and enrollment forms.
"I. Conduct all necessary claim inquiries appropriate to Plan provisions, including but not limited to coordination of benefits, preexisting conditions, usual and customary expense levels, etc.
"J. Provide verification and/or certification of benefits to purveyors of services.
"K. Deny all ineligible claims with notification to the City.
"L. Provide the City with a printout of all benefit payments and answer all written, telephone and personal claim inquiries from the City employees.
"M. Provide monthly claim reports by line of coverage; i. e., hospital, surgical, etc. in detail.
"N. Prepare and furnish to providers of service required annual information returns in compliance with Revenue Rulings 69-595 and 70-608. The Administrator will print and bear expense of forms.
"O. Establish claim control procedures and claim administration to the same extent as if benefits were totally insured by the Administrator on a conventional group insurance basis.
"P. Bond all employees of Administrator who handle monies or properties of the City.
"Q. Make available for the City's inspection at all reasonable times the Plan's claim administration records and files for the City's participants.
"R. Estimate the amount of unreported claims at the end of each contract year based on claim-lag experience.
"S. The Administrator will provide two (2) hospital identification cards to all Plan participants.
"T. Deal directly with Plan participants with respect to hospital claim submission. Other than hospital claims will be submitted to the Administrator by the City.
"Claim eligibility and certification of coverage to purveyors of service will be based on a monthly roster of participants furnished to the Administrator by the City."
If these services fall within the definition of "professional services" contemplated by the city charter, the contract forms an exception to the requirement of public bidding necessary for any other service contract. We refer to two previous cases of this court wherein we considered the application of contracts to the charter provisions. In New Orleans Transfer Company, Inc. v. City of New Orleans, 284 So.2d 362 (La.App. 4th Cir. 1973) we reaffirmed the general rule *1364 relating to the interpretation of public bidding laws as set out in the case of Boxwell v. Department of Highways, 203 La. 760, 13 So.2d 627 (La.1943) that the public bidding laws were enacted in the interest of and for the protection of the tax paying citizens, and that open competitive bidding is a thing to be desired. In the case of Transportation Displays, Inc. v. City of New Orleans, 346 So.2d 359 (La.App. 4th Cir. 1977) we held that the question as to whether competitive bidding by firms providing services is feasible and is contemplated by the public bidding laws must be determined by the terms of the contract.
With these principles in mind, we have considered the evidence as to the nature of the services required to be performed under the contract requirements. It is apparent that the vast bulk of the services are basically clerical. Much may be performed by persons of high school education and above who have been trained in the various degrees of skill required for claims adjusting and for work of processing the various applications and applying certain rules and regulations leading to a decision to approve or deny claims. A considerable portion of the work is simply clerical in nature. At the same time, it is apparent that there are decisions that cannot be made by employees in the lower echelon who must consult with their superiors and supervisors to ascertain the proper result in questionable claims, or those claims to which the rules do not clearly apply. These supervisors are required to have a higher degree of skill and expertise in handling these claims. Superimposed upon this structure it is necessary to have at least one person of considerable skill and expertise to exercise the function of account executive. It is he who must oversee the formulation of regulations and coordinate the entire operation with the city's consultants and in accordance with its policies. It is also apparent that there are services to be performed in connection with this contract that can only be answered by professionals such as doctors, or on the insurance side by underwriters or actuaries. However, it is equally apparent that these services form only a small portion of the services contracted for and are usually obtained on a consulting basis in the case of a smaller, independent contractor as here, or furnished in house by other departments of a larger contractor such as insurance companies providing such services.
From the evidence presented, we cannot say that the services provided are exclusively professional or exclusively not professional services. There are no clear-cut guide lines to afford officials a precise determination, and it is apparent from the testimony that officials have had in the past to rely upon their own judgment as to whether such a contract may fall within the exception provided. We note for example the fact that this same basic contract was awarded to Blue Cross at its inception by negotiation rather than public bid. We also consider the testimony of Mr. Terrell, the Deputy Commissioner of Administration for the State of Louisiana concerning the problems that the state had encountered in its attempt to secure efficient administration of public employee health benefit contracts, which served as part of the basis for the enactment of Act No. 772 of 1978, R.S. 39:1481, et seq., setting out the legislative requirements for procurement of professional, personal and consulting services. The evidence in this case shows that the chief administrative officer followed the basic policy established by prior administrations, obtained the approval of the City Attorney's office for entering into this contract, and negotiated it in good faith with a view of obtaining efficient administration of the plan as well as economy. However, his appreciation of a contract for professional services differs from ours, and we must affirm the decision of the trial court.
In the Transportation Displays, Inc. case supra, we interpret the word "professional" as follows, 346 So.2d 363, Footnote 5:
"5. `"Professional"' is not used here to describe the quality of the services or to distinguish the highly proficient from *1365 the mere amateurs, but rather denotes a person in a profession which required years of education and service for one to attain competence and which calls for a high order of intelligence, skill and learning."
Several of the witnesses, and various legal authorities, have proposed definitions of "professional services," "personal services" and variations on these types of services. As an example, we refer to the definitions in the State Service Procurement Law as defined in R.S. 39:1484:
"(15) `"Personal Service"' means work rendered by individuals which require use of creative or artistic skills, such as but not limited to graphic artists, sculptors, musicians, photographers, and writers, or which require use of highly technical or unique individual skills or talents, such as, but not limited to, paramedicals, therapists, handwriting analysts, and expert witnesses for adjudications or other court proceedings.
* * * * * *
"(17) `"Professional Service"' means work rendered by an independent contractor who has a professed knowledge of some department of learning or science used by its practical application to the affairs of others or in the practice of an art founded on it, including but not limited to lawyers, doctors, dentists, veterinarians, architects, engineers, landscape architects, and accountants. A profession is a vocation founded upon prolonged and specialized intellectual training which enables a particular service to be rendered. The word `"professional"' implies professed attainments in special knowledge as distinguished from mere skill."
Suffice it to say that each definition is important to the end sought to be achieved, and each statute or case must be relegated to its own internal purposes. The city's charter simply says that "the rendering of any services to the City, other than professional services" shall be subject to competitive bidding. We hold that the present contract requires services the vast bulk of which is services other than professional services as defined in Transportation Displays, Inc., supra, and such a contract can only be let after competitive bidding.
Accordingly, we affirm the judgment appealed from.
AFFIRMED.